IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (304)932-8071 SUBSCRIBED TO BY "PREPAID, PREPAID." | Case No. 2:21-mj-00162 <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Genevieve D. Baushke, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (304)932-8071 hereinafter the SUBJECT TELEPHONE, subscribed to by "Prepaid, Prepaid," which is utilized by JAMES EDWARD BENNETT, III (BENNETT), whose service provider is AT&T, a wireless telephone service provider, which is headquartered at 208 South Akard Street, Dallas, Texas, 75202. The SUBJECT TELEPHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent employed by the United States Department of Justice, the Federal Bureau of Investigation (hereinafter "FBI"), and as such I am a "federal law enforcement

officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am authorized to apply for federal search warrants I have been employed as a Special Agent of the FBI since 2020. I am currently assigned to the FBI Charleston Resident Agency, Charleston, West Virginia. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received special training in controlled substance investigations, white-collar crime, cyber-crime, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. As part of my duties with the FBI, I investigate violations of federal law, including drug trafficking offenses enumerated in Title 21 U.S.C. §§ 841, 843, and 846, and I have been the affiant on multiple search warrants, pen register trap and trace order applications (PRTTs), and personally participated in arrests and search warrants.

3. During my tenure with the FBI, I have participated in multiple drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous recorded conversations and records of drug traffickers; (d) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (e)

conducted surveillance of individuals engaged in drug trafficking. Through my training, education, and experience, I have become familiar with (a) the manner by which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement. The facts in this affidavit come from personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probably cause for the requested warrant and does not set forth all my knowledge about this matter.

4. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. Among other duties, I am participating in an investigation relating to the distribution of controlled substances by TREYDAN LEON BURKS (BURKS), BRIAN DANGELO TERRY (TERRY), JASON OXLEY (OXLEY), RAMON ALSTON (ALSTON), JAMES EDWARD BENNETT, III (BENNETT), SHANE KELLY FULKERSON (FULKERSON), and other persons known; and others as yet unknown, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, that is, distribution of controlled substances; use of a

3

communication facility to facilitate drug trafficking; and conspiracy to distribute controlled substances.

5. Beginning on May 4, 2021, the Honorable Irene C. Berger, United States District Court Judge in the Southern District of West Virginia, entered orders authorizing the interception of wire and/or electronic communications over telephones used by OXLEY, TERRY, BURKS, ALSTON, and FULKERSON (TARGET TELEPHONES #1 through #11). Intercepted communications occurring over the TARGET TELEPHONES have confirmed that the SUBJECTS are heavily involved in distributing large quantities of methamphetamine and heroin in and around Kanawha County, West Virginia and within the Southern District of West Virginia.

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. On August 14, 2021 at approximately 12:53 PM (Session 2152), BURKS, on TARGET TELEPHONE #8, contacted BENNETT on telephone (304)932-8071. The following was discussed:

BENNETT:     Yo.

BURKS:       So, where the work at?

BENNETT:      In the freezer. You told Black he could get some of it?

BURKS:        Yeah. Where the other G at? What you do with it?

BENNETT:      Nigga, I got it.

BURKS:        So, what you-what you bout to do? You 'bout to go out to fuckin'- up there to Ohio.

BENNETT:      Yeah, nigga.

&lt;talking over each other&gt;

BURKS:        Oh. What you talkin' bout, Ohio? You stupid bitch.

BENNETT:      I was just talkin' shit. Shut your bitch ass up.

BURKS:        Alright.

8. Based on my training, experience, and the facts of the investigation, BURKS and BENNETT are roommates. In this call, BURKS asked BENNETT where the drugs were located inside the residence, ("So, where the work at?"). BENNETT stated it was in the freezer and asked if TERRY was allowed to take some of it, ("In the freezer. You told Black he could get some of it?"). BURKS said TERRY can take some of it and then asked where the rest of the drugs were located, ("Yeah. Where the other G at?

5

What you do with it?"). BENNETT said he had the rest of the drugs in his possession ("Nigga, I got it").

    9.   On August 16, 2021 at approximately 2:10 PM (Session 2258), BURKS received an incoming call, on TARGET TELEPHONE #8, from BENNETT, on telephone (304)932-8071. The following was discussed:

| | |
|---|---|
| BENNETT: | What's up brother? |
| BURKS: | What's good? |
| BENNETT: | Where my TV at bitch? |
| BURKS: | I'm using it. |
| BENNETT: | Ah, um, uh- I bought you a fuckin shirt. |
| BURKS: | What? |
| BENNETT: | I bought your shirt. |
| BURKS: | Alright. |
| BENNETT: | Just tellin' ya and I wanted to know, uh, fuckin, uh, shit I can get this fuckin yam? |
| BURKS: | Huh? |
| BENNETT: | Can I get this yam? |
| BURKS: | Are you going to pay me for my other one? |
| BENNETT: | Yeah. |
| BURKS: | Yeah. Pay me. |
| BENNETT: | I am, bro. I just want to know before I try, I got you brother. |

6

| | |
|---|---|
| BURKS: | Yeah. Pay me, |
| BENNETT: | Bro, I pay you everytime. Quit treating me like that, bruh. I got you, bruh. |
| BURKS: | I ain't treatin' you like nothin'. I'm makin' sure I get my bread, bruh. |
| BENNETT: | You know I got you brother. You know I got you brother. |
| BURKS: | Alright. Alright |
| BENNETT: | Alright. |

10. Based on my training, experience, and the facts of the investigation, BENNETT asked BURKS if he had any drugs available, ("Just tellin' ya and I wanted to know, uh, fuckin, uh, shit I can get this fuckin yam?"). BURKS asked if BENNETT was going to pay for his last purchase of controlled substances, ("Are you going to pay me for my other one?"). BENNETT responded he would, ("Yeah"). BURKS told BENNETT to pay him, (Yeah. pay me"). BENNETT responded that he would pay BURKS, (I am, bro. I just want to know before I try, I got you brother").

11. On August 24, 2021 at approximately 10:31 PM (Session 3018), BURKS, on TARGET TELEPHONE #8, contacted BENNETT, on telephone (304)932-8071. The following was discussed:

| | |
|---|---|
| BENNETT: | Hello. |
| BURKS: | Hey, brah? |

7

| | |
|---|---|
| BENNETT: | Yeah. |
| BURKS: | I need some weed though. Can you get it for me? |
| BENNETT: | Uh, yeah what you want? |
| BURKS: | You gone be around him? |
| BENNETT: | I'm mean, yeah, I can I mean I can do my best, bro. |
| BURKS: | You got 100 dollars on you? |
| BENNETT: | Yeah. |
| BURKS: | Alright. |
| BENNETT: | Yeah, I got you but this is going on my tab or something though? If you can't give it back. I got about 160 bucks. |
| BURKS: | What did you say? |
| BENNETT: | I said it's going on your tab if you can't pay me back. I'm going-I got about 160 bucks. |
| BURKS: | Who said I couldn't? |
| BENNETT: | I mean, I didn't know, brah. I didn't, I don't know what you, you know? |
| BURKS: | Yeah. |
| BENNETT: | Ok. |
| BURKS: | Alright. |

12. Based on my training, experience, and the facts of the investigation, BURKS told BENNETT he needs marijuana and asked him to purchase it for him, ("I need some weed though. Can you get it for me?). BENNETT advised that he would try his best to get BURKS marijuana, ("I mean, yeah, I can I mean I can do my best, bro."). BURKS asked BENNETT if he had $100 for payment for the marijuana that BURKS wanted, ("You got 100 dollars on you?"). BENNETT replied that he did, ("Yeah").

13. The facts of this investigation gathered over the course of several months, to include information obtained by intercepted communications and surveillance, have revealed that BURKS often relies upon BENNETT to perform errands related to BURKS' drug trafficking activities. BURKS communicates with BENNETT and others by cellular telephone using voice calls and texts as well as applications like iPhone Facetime that operate on cellular telephones like the SUBJECT TELEPHONE.

14. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and

cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

15. Based on my training and experience, I know that AT&T can collect E-911 Phase II data about the location of the SUBJECT TELEPHONE, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on AT&T's network or with such other reference points as may be reasonably available.

16. Based on my training and experience, I know that AT&T can collect cell-site data about the SUBJECT TELEPHONE. Based on my training and experience, I know that for each

10

communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

  17. The above-stated information establishes probable cause that BURKS and BENNETT are engaged in the distribution of controlled substances and that the SUBJECT TELEPHONE is used to facilitate those drug trafficking activities.  Further, the location information for the SUBJECT TELEPHONE sought by this warrant will constitute relevant evidence of the criminal activity by identifying locations where BURKS and BENNETT frequently visit (i.e. locations where drugs and evidence of drug trafficking is stored or sold), where and when they travel, and where they meet with each other, suppliers, and customers.

**AUTHORIZATION REQUEST**

18. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

19. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed (i.e. approximately November 17, 2021). This investigation is ongoing and involves multiple targets of investigation, multiple states and federal districts, and complex investigative techniques. There is reasonable cause to believe that providing immediate notification of the warrant is likely to have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the SUBJECT TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant

12

authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

20. I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

21. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT TELELPHONE outside of daytime hours.

13

22. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Genevieve D. Baushke
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by telephonic or other reliable means pursuant to Fed. R. Crim. P. 4.1 on September 3, 2021.

OMAR J. ABOULHOSN
UNITED STATES MAGISTRATE JUDGE